# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL NO. 3:05CV83-H

| | |
|---|---|
| AMERICAN MORTGAGE NETWORK, INC., ) <br> ) <br> **Plaintiff,** ) <br> ) <br> vs. ) <br> ) <br> MICHAEL D. SHELTON and PAMELA A. ) <br> SHELTON, ) <br> ) <br> **Defendants.** ) <br> ) | **MEMORANDUM AND ORDER** <br> **AND JUDGMENT** |

**THIS MATTER** is before the Court on the following motions and memoranda:

1. The "Defendants' Motion to Approve Procedure for Sale of House and Brief in Support ..." (document #22) filed February 2, 2006;

2. The Plaintiff's "Response ..." (document #23) filed February 16, 2006;

3. "Defendants' Reply ..." (document #26) filed February 22, 2006;

4. "Plaintiff's Motion for Summary Judgment" (document #27) and "Memorandum ... in Support [with attached exhibits]" (document #28), both filed March 3, 2006;

5. "Defendant's Response to Plaintiff's Motion for Summary Judgment [with attached exhibits]" (document #31) filed March 17, 2006;

6. Plaintiff's "Reply ..." (document #32) filed March 28, 2006; and

7. "Defendants' Surreply ..." (document #33) filed April 4, 2006.

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these Motions are now ripe for disposition.

Having carefully considered the parties' arguments, the record, and the applicable authority,

the undersigned will <u>deny</u> the Defendants' "Motion to Approve Procedure for Sale of House" (document #22), and <u>grant in part</u> and <u>deny in part</u> the Plaintiff's "Motion for Summary Judgment" (document #27), as discussed below.

## I. <u>FACTUAL AND PROCEDURAL HISTORY</u>

This is a declaratory judgment action brought pursuant to the Truth in Lending Act, 15 U.S.C. 1601, <u>et. seq.</u> ("TILA").

The Plaintiff, American Mortgage Network, Inc., is a residential mortgage lender that conducts business throughout the United States and makes loans through approved mortgage brokers. The Plaintiff then sells the loans on secondary markets to banks and institutional investors.

The Defendants, Michael D. Shelton and Pamela A. Shelton, are residents of Gaston County, North Carolina. Mr. Shelton is self-employed as a real estate appraiser who conducts business as "Accurate Evaluation Services." Mr. Shelton employs three other appraisers, including Ashley R. Miller, who prepared the appraisal report that Plaintiff relied upon when it approved the Defendant's loan application, discussed below.

Sometime in March 2000, the Defendants purchased a house at 907 Weymouth Drive in Gastonia, North Carolina (the "House") for $253,000, which they used as their primary residence. On July 6, 2004, the Defendants signed a contract to purchase a to-be-built custom home in Stanley, North Carolina (the "Custom Home"). Under the terms of the purchase contract, the Defendants were not required to obtain a construction loan, and following a delay in obtaining a building permit, construction began on December 13, 2004.

In his deposition, Mr. Shelton admitted that in November 2004, he began searching for a new

loan to consolidate two pre-existing loans secured by the House in order to improve his credit score so that he could obtain a more favorable interest rate when Defendants purchased their new Custom Home.

In early December 2004, and through Waterford Financial Services, Inc. ("Waterford"), a licensed mortgage broker approved to conduct business with Plaintiff, the Defendants applied for a residential mortgage loan on the House from the Plaintiff. As part of the application process, the Defendants submitted to the Plaintiff a loan application stating, among other things, that Mr. Shelton's 2004 income was $97,200, an "independent appraisal report" prepared by Mr. Miller supposedly at Waterford's request that estimated the fair market value of the House to be $370,000, and an "Occupancy Agreement" representing that the Defendants would occupy the House as their primary residence throughout the 12-month period immediately following the loan closing.

Based at least in part on these representations, the Plaintiff approved a loan of $317,000 at a six percent (6%) interest rate, which was closed on December 16, 2004. The loan proceeds were used primarily to pay off the two pre-existing loans in the aggregate amount of $312,421,21.

As the Plaintiff learned during discovery in this proceeding, however, and taking the evidence in the light most favorable to the Defendants, Mr. Shelton's actual 2004 income was a fraction of what he represented it to be ($97,200), that is, the Defendants' 2004 tax return reflects that after paying his business-related expenses, Mr. Shelton's 2004 income was only $34,236. Furthermore, it is now undisputed that Mr. Miller was neither "independent," nor retained by Waterford to do the appraisal as Mr. Shelton represented, but rather worked for Mr. Shelton.[1] Indeed, Mr. Shelton

---

[1] It is undisputed that Mr. Shelton trained Mr. Miller and that Mr. Miller has worked exclusively for Mr. Shelton for more than five years.

admitted in his deposition that he participated in the preparation of Mr. Miller's report. This misrepresentation is rendered even more egregious in that a subsequent, truly independent appraisal revealed that the House's true value is only $300,000, considerably less than Mr. Miller's $370,000 appraisal and less even than the amount of the loan.[2]

Even taking the evidence in the light most favorable to the Defendants, their signed statement that they intended to reside in the House until December 16, 2005 was also knowingly false. As discussed above, at the time they applied for the loan from the Plaintiff, the Defendants had entered into a contract to purchase the Custom Home, and construction was under way on the date of the closing. The Defendants closed the purchase of the Custom Home on April 29, 2005 (through a residential mortgage loan obtained through another lender) and moved into it on May 1, 2005. Mr. Shelton also admitted in his deposition that he did not disclose the existence of the Plaintiff's loan when he applied for the loan on the Custom Home.[3]

In its present Motion and briefs, the Plaintiff credibly states that had it known of these misstatements prior to the closing, it would not have made the loan.

Sometime in January 2005, during an internal audit, the Plaintiff discovered that the loan-related fees which the Defendants had actually paid were $100 more than the amount stated in the Truth in Lending Disclosure they were given at the closing. It is undisputed that this increase resulted from the settlement agent's failure to provide the Plaintiff with a final total of his charges

---

[2] The undersigned notes that the Defendants have abandoned any pretense that Mr. Miller's appraisal was accurate, contending in their present briefs that the House is worth only "what a buyer will pay," rather than $370,000 as they represented initially to the Plaintiff.

[3] Although the instant proceedings are *civil* in nature, the material false statements made by the Sheltons to obtain both loans would also violate state and, if the loans were federally guaranteed, federal *criminal* statutes.

prior to the closing. The parties also now agree that because the discrepancy did not exceed $100, the Plaintiff was not required by TILA to inform the Defendants of or otherwise take any action concerning the error.

As is its normal practice in these circumstances, however, and because it believes that potential buyers on the secondary mortgage market are concerned about even minor discrepancies, the Plaintiff decided to reopen the rescission period, that is, to allow the Defendants the option to rescind the loan.

In a letter dated January 24, 2005, the Plaintiff notified the Defendants that they could elect to rescind the loan as a result of the fee discrepancy, and explained the procedure for rescinding the loan and beginning the process of "unwinding" the transaction, that is, by signing and returning an enclosed Notice of Right to Cancel within three business days. In the same letter, the Plaintiff also offered, however, simply to refund the Defendants $100.

On January 27, 2005, the Defendants signed and returned the Notice of Right to Cancel, expressing their intention to cancel the loan.

On February 16, 2005, and through their then-counsel, J. Elliott Field, the Defendants informed the Plaintiff that they were unable to return the loan proceeds. Instead, the Defendants offered to sell the House to the Plaintiff for the difference between its "appraised value" ($370,000) and the net loan proceeds ($313,468.39). When the Plaintiff declined to buy the House on these terms, the Defendants insisted that the Plaintiff cancel the Deed of Trust on the House regardless of their admitted inability to return the loan proceeds. Through the present date, the Defendants have not made any of the monthly payments or otherwise repaid any of the principal or accrued interest

on the loan.[4]

On February 17 and March 15, 2005, the Plaintiff mailed the Defendants automated collection notices stating that the loan was past due and demanding payment. The Plaintiff concedes that in light of the Defendants' initial acceptance of its offer to rescind and "unwind" the loan, sending those collection notices was a "mistake." It is undisputed that after Mr. Field complained to the Plaintiff's representatives, the Plaintiff took action to ensure that no more notices would be sent and, in fact, none were.

On February 23, 2005, the Plaintiff filed this action, seeking a declaratory judgment that it had not violated TILA and that establishes an "equitable procedure" for unwinding the transaction.

On April 13, 2005, the Defendants, then represented by John W. Taylor, filed an "Answer and Counterclaim," seeking damages for violation of TILA and state law, as well as a declaratory judgment canceling the Deed of Trust and "declaring that [the Sheltons] are not indebted to the Plaintiff and have no further obligation to it." Document #5 at 14. In their present briefs, the Defendants attempt to justify their initial request for more than a $300,000 windfall by stating that the Plaintiff's offer to allow them to rescind the loan led them to believe that something much more serious than a $100 underestimate of the settlement agent's fee was actually amiss.

On June 1, 2005, the Plaintiff served its First Set of Interrogatories and Request for Production of Documents.

On July 29, 2005, the Plaintiff offered to allow the Defendants to "unwind" the loan by returning the new loan proceeds, $313,468.39, that is, the Plaintiff offered to waive all accrued

---

[4] In its briefs, the Plaintiff states that the amount due as of February 1, 2006, excluding attorneys' fees and costs, was $343,325.03, consisting of the $317,000 principal balance, $21,542.98 in accrued interest, and $4,782.05 the Plaintiff has advanced to pay the home owners insurance and property taxes on the House.

6

interest so long as the net proceeds were returned by September 2, 2005. The Defendants declined this offer. The Plaintiff alleges and the Defendants do not dispute that the existence of the mortgage loan on the Custom Home prevents them from being able to refinance and repay the Plaintiff's loan.

On September 19, 2005, and after Plaintiff's counsel made numerous telephone calls inquiring when responses would be forthcoming, the Defendants served their Responses to the Plaintiff's discovery requests. The same day, Plaintiff's counsel informed defense counsel that the Responses were incomplete, that is, that the Defendants had failed to produce their tax returns for 2003 and 2004 which were the subject of Request to Produce No. 17.

On October 5, 2005, Mr. Taylor wrote Plaintiff's counsel that "[he] d[id] not have the tax returns ... and c[ould] not represent ... when [he] w[ould] have them to produce." Exhibit C to "Motion to Compel and for Imposition of Sanctions" (document #16). The Plaintiff alleges that when its counsel offered to refrain from filing a Motion to Compel in exchange for the Defendants' commitment to produce the tax returns at least one day prior to Mr. Shelton's deposition, which was scheduled for October 20, 2005, Mr. Taylor responded that he could not provide any assurances that the tax returns would ever be produced.

Accordingly, on October 7, 2005, the Plaintiff filed its "Motion to Compel and for Imposition of Sanctions," asking the Court to order the Defendants to produce the subject tax returns and to pay the Plaintiff's attorneys' fees and other costs incurred in preparing and prosecuting that Motion.

On October 12, 2005, Mr. Taylor filed his "Motion to Withdraw as Attorney for Defendants" (document #17), which the undersigned granted in an "Order" entered the following day. See document #18 (also extending deadline for responding to Plaintiff's Motion to Compel to November

15, 2005, and "advis[ing] [the Defendants] that regardless of whether they retain other counsel, they must adhere to all deadlines in this matter and must comply with the Court's Orders, the Local Rules, and the Federal Rules of Civil Procedure").

In their Response, the then-pro se Defendants blamed the discovery dispute, as well as the posture that they had taken in this litigation through that point, on Mr. Taylor. They admitted, however, that sometime in July 2005, they informed Mr. Taylor that they had decided not to produce their tax returns to the Plaintiff and that they refused to provide even their own lawyer with copies of the disputed documents. See Document #19 at 2-5.

On December 1, 2005, the undersigned granted the Plaintiff's "Motion to Compel and for Imposition of Sanctions," compelling the Defendants to serve supplemental discovery responses, including producing the tax returns, and ordering them to pay the Plaintiff's attorneys fees and other costs associated with that dispute. See Document #20.

On January 30, 2006, the Defendants' present counsel entered their appearance in this case.

On February 2, 2006, the Defendants filed their "Motion to Approve Procedure for Sale of House," which is essentially a Motion for Partial Summary Judgment. The Defendants ask the Court to cancel the Deed of Trust, allow them an indefinite period of time to sell the Home to a buyer and at a price of their choosing in order to raise any funds they may be required to return to the Plaintiff, and to preserve the parties' other claims for trial, including the Defendants' remaining counterclaims for damages. Additionally, the Defendants contend that they are still entitled to rescind the loan, and, therefore, have no liability for accrued interest or the Plaintiff's attorneys' fees and other costs, and are obligated, if at all, to return only the net loan proceeds.

On March 3, 2006, the Plaintiff filed its "Motion for Summary Judgment," in which it

withdraws its request that the Court establish a procedure for unwinding the loan. Instead, the Plaintiff asks the Court to declare both that the Plaintiff complied with TILA at all times relevant to this proceeding, to dismiss the Defendants' counterclaims, and otherwise to leave the Plaintiff free to institute a foreclosure proceeding in state court.

In their Response to the Plaintiff's Motion, the Defendants admit, among other things, that "despite [their] counter-claim alleging otherwise, Plaintiff's TILA disclosure **did not** violate TILA," document #31 at 1 (emphasis in original), but continue to maintain that the Plaintiff's conduct following the Defendants' election to rescind the loan was unlawful.

In its Reply, the Plaintiff clarifies that it is not seeking dismissal with prejudice of the Defendants' state law counterclaim for unfair debt collection practices, but consents to the Court declining supplemental jurisdiction of that claim and dismissing it without prejudice to the Defendants' right to raise that claim in the ensuing state action.

The parties' motions have been fully briefed as set forth above and are, therefore, ripe for disposition.

## II. DISCUSSION

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Accord Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue

9

for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. Id. at 249-50. Moreover, it is well settled that "affiants' statements [must be] made based on personal knowledge" and may not merely repeat the non-moving party's allegations. See Bryant v. Bell Atlantic Maryland, Inc., 288 F.3d 124, 135 (4th Cir. 2002) (considering disputed affidavits which were based on affiants' personal knowledge).

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion. Id. at 255; Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990); Cole v. Cole, 633 F.2d 1083 (4th Cir. 1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

**B. Plaintiff's Motion for Summary Judgment**

**1. Declaratory Judgment of Compliance with Truth in Lending Act**

TILA expressly provides that:

In connection with credit transactions ... that are secured by real property or a dwelling, the disclosure of the finance charge and other disclosures affected by any finance charge—
(1) shall be treated as being accurate for purposes of this subchapter if the amount disclosed as the finance charge—

(A) does <u>not vary</u> from the actual finance charge by more than $100.

15 U.S.C. §1605(f)(1)(A) (emphasis added). <u>See also</u> 12 CFR § 226.18(d)(1)(i) (disclosed finance charges understated by no more than $100 "shall be treated as accurate"). Accordingly, as the parties now agree, the Plaintiff's financial charge disclosure complied with TILA and it was required neither to notify the Defendants of the $100 underestimate in fees nor to re-open the rescission period.

The remaining issue is whether having voluntarily elected to re-open the rescission period, the Plaintiff's subsequent refusal to unilaterally cancel the Deed of Trust was lawful. It is well settled that rescission is an equitable remedy and while TILA may grant borrowers the remedy of rescission, or in this case, where a lender elects to offer a debtor the right to rescind, application of the remedy is governed by equitable principles, and courts routinely condition rescission on a borrower's tender of amounts previously advanced by the lender, while leaving the security interest in place until the tender is made. <u>See, e.g.</u>, <u>Yamamato v. Bank of New York</u>, 329 F.3d 1167, 1173 (9th Cir. 2003); <u>Powers v. Sims</u>, 542 F.2d 1216, 1222 (4th Cir. 1976); <u>and</u> <u>AFS Financial, Inc. v. Burdette</u>, 105 F.Supp.2d 881, 881-82 (N.D. Ill. 2000). Courts have also denied rescission when a borrower fails to demonstrate an ability to tender the funds advanced by the lender in a timely manner. <u>Accord</u> <u>Yamamato</u>, 329 F.3d at 1169 (affirming trial court's dismissal of rescission claim after borrowers failed to tender loan proceeds).

In <u>Powers</u>, the Fourth Circuit Court of Appeals held that:

> there is nothing in the statutory provisions of the right of rescission or in § 1635(b)'s provision of the procedural steps in effecting ... rescission which limits <u>the power of a court of equity to circumscribe the right of rescission to avoid the perpetration of stark inequity</u>.

542 F.2d at 1221 (emphasis added). Indeed, rescission "will not be judicially enforced unless it is so conditioned that the lender will be assured of receiving its legal due." Id. The Court went on to explain that:

> [s]urely, the Congress did not intend to require a lender to relinquish its security interest when it is . . . known that the borrowers did not intend and were not prepared to tender restitution of the funds expended by the lender in discharging the prior obligations of the borrowers.

Id. at 1221.

This is precisely the situation in this case, where having opted to rescind the loan – which they had obtained only by making materially false statements to the lender – the Defendants then not only refused to return the loan proceeds but also communicated an inability to do so. As of the present date, the Defendants do not indicate a willingness or ability to repay the loan, but seek leave of Court to sell the House in a time and manner of their choosing, and in the meantime, to continue to receive the benefit of what has been – for nearly 16 months – a de facto interest-free loan.

Moreover, assuming arguendo that the Defendants' refusal to return the loan proceeds was not the product of a misguided attempt to capture a windfall at the Plaintiff's expense, but rather their inability to obtain substitute financing, it is clear that the Defendants' own inequitable and unethical conduct is the reason they face that dilemma. As set forth above, the Defendants made at least three serious misstatements to the Plaintiff in order to induce it to make the loan, each of which is directly related to their present predicament: they overstated Mr. Shelton's income nearly three-fold, submitted a supposed "independent" appraisal that had actually been prepared by Mr. Miller and grossly overvalued the House, and stated falsely that they intended to live in the House for at least 12 months. Mr. Shelton admitted that contrary to the latter representation, he sought the

loan from the Plaintiff in order to enable the Defendants to obtain more favorable financing on the Custom Home. Finally, having taken a mortgage loan on the Custom Home, something Mr. Shelton was apparently only able to accomplish by not disclosing the loan on the House, the Defendants are now unable to refinance the Plaintiff's loan.

In short, in light of the Defendants' knowing, deliberate, and repetitive malfeasance that contributed to their inability to refinance the loan and return the loan proceeds, the Plaintiff's refusal to unilaterally cancel the Deed of Trust can hardly be characterized as unlawful or inequitable. Accord Yamamato, 329 F.3d at 1173; Powers, 542 F.2d at 1222; and AFS Financial, Inc., 105 F.Supp.2d at 881-82.

Accordingly, where even taking the facts in the light most favorable to the Defendants, the Plaintiff's conduct, both before and after the Defendants' attempt to rescind the loan, complied with the Truth in Lending Act and was otherwise equitable, the Plaintiff's Motion for Summary Judgment on its declaratory judgment claim will be granted.

**2. Defendants' Counterclaims**

**a. TILA Counterclaims**

As clarified in their briefs, the Defendants ask the Court to declare the loan rescinded, that is, to limit their obligation to the Plaintiff to returning the net loan proceeds and to cancel the Deed of Trust regardless of when or how much of those proceeds are returned, and also seek to recover damages for the Plaintiff's alleged violation of TILA.

At the outset, and for the reasons discussed above, the Court concludes that the Plaintiff did not violate TILA when it initially refused to cancel the Deed of Trust, and therefore, that the

Defendants may not recover damages under that statute. Accordingly, the Plaintiff's Motion for Summary Judgment will be <u>granted</u> as to the Defendants' federal damages claim.

Concerning the broader issue, the undersigned concludes that the same equitable principles also mandate that the Defendants not be permitted to rescind the loan either. In light of the Defendants' previously-discussed unethical and perhaps criminal conduct that both induced the Plaintiff to make the loan and made them unable to repay it, if the loan were to be rescinded and the Deed of Trust cancelled, the Plaintiff would hardly be "assured of receiving" the loan proceeds to which it is clearly entitled. <u>Accord</u> <u>Yamamato</u>, 329 F.3d at 1169 (affirming trial court's dismissal of rescission claim after borrowers failed to tender loan proceeds); <u>and</u> <u>Powers</u>, 542 F.2d at 1221 (rescission "will not be judicially enforced unless it is so conditioned that the lender will be assured of receiving its legal due"). This is particularly true where the value of the House appears to be substantially less than the value the Defendants submitted to the Plaintiff in their misleading appraisal report, less even than the amount of the loan.

Additionally, it would be inequitable for the Defendants to now avail themselves of rescission, which was offered to them more than 14 months ago, when their legal posture in this case and misconduct during discovery have caused unnecessary delay and substantial additional expense to the Plaintiff. Although recent advice from their present counsel may have slightly moderated their position, the Defendants' initial, seemingly intractable, and entirely untenable position in this proceeding has been that a simple $100 error entitled them to cancellation of a Deed of Trust securing a $317,000 loan and otherwise simply to walk away from the transaction. Indeed, the Defendants declined the Plaintiff's offer in July 2005 to allow them to "unwind" the loan by returning the loan proceeds free of interest.

14

Against advice of their then-counsel, Mr. Taylor, the Defendants also refused to produce their tax returns, which delayed the discovery process by more than six months, and which as the Defendants must have realized at the time, contained conclusive evidence that Mr. Shelton had overstated his income when applying for the loan. In other words, the Defendants' refusal to produce those highly-relevant documents was entirely unreasonable and they bear sole responsibility for the resulting delay.

For these reasons, the Plaintiff's Motion for Summary Judgment will be <u>granted</u> as to the Defendants' Truth in Lending Act claims.

### b. State Law Counterclaim

The Defendants also assert a claim against the Plaintiff for allegedly taking debt collection actions prohibited by N.C. Gen. Stat. §§ 75-50 through 75-56, that is, for sending the two automated collection notices. Having disposed of all federal claims in this action, there being no other basis for exercising federal subject matter jurisdiction, and with the Plaintiff's consent, the undersigned will decline supplemental jurisdiction of the Defendants' state law claim, which will be <u>dismissed without prejudice</u> to their right to raise the same claim in state court. Accord <u>Chesapeake Ranch Water Company v. Board of Com'rs of Calvert County</u>, 401 F.3d 274, 277 (4th Cir. 2005) (having dismissed federal claims, district court properly declined supplemental jurisdiction of state claims which were dismissed without prejudice); <u>and</u> <u>Mercer v. Duke University</u>, 401 F.3d 199, 202 (4th Cir. 2005) (same).

### C. Defendants' Motion to Approve Procedure for Sale of House

In their Motion, the Defendants ask the Court to allow them to sell the House on terms almost

entirely favorable to them, that is, at a time, to a seller, and at a price of their choosing, while imposing no liability on them for interest on the loan, and to proceed to trial on their damages claims. For the legal and equitable reasons that the Plaintiff's Motion for Summary Judgment will be <u>granted</u>, the Defendants' Motion must and will be <u>denied</u>.

### III. ORDER

**NOW THEREFORE, IT IS ORDERED:**

1. The Defendants' "Motion to Approve Procedure for Sale of House" (document #22) is **DENIED**.

2. The Plaintiff's "Motion for Summary Judgment" (document #27) is **GRANTED IN PART** and **DENIED IN PART**, that is:

   a. The Plaintiff American Mortgage Network, Inc. is **GRANTED** a **DECLARATORY JUDGMENT** that at all times relevant to this proceeding, its actions complied with the requirements of the Truth in Lending Act, 15 U.S.C. 1601, <u>et. seq.</u>.

   b. With the consent of the Plaintiff, its claim for a declaratory judgment establishing a procedure unwinding the subject loan is **DENIED WITHOUT PREJUDICE** to its right to pursue foreclosure or any other remedy in state court.

   c. The Defendants' federal counterclaims are **DISMISSED WITH PREJUDICE**.

   d. The Defendants' state law counterclaim for unfair debt collection practices is **DISMISSED WITHOUT PREJUDICE** to the Defendants' right to raise that claim in state court.

3. The Clerk is directed to send copies of this Memorandum and Order and Judgment to counsel for the parties; and to Mr. Taylor.

**SO ORDERED, ADJUDGED, AND DECREED.**

Signed: April 6, 2006

Carl Horn, III
United States Magistrate Judge